Dena C. Sharp (State Bar No. 245869)
Adam E. Polk (State Bar No. 273000)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, California 94108
415.981.4800
dsharp@girardsharp.com
apolk@girardsharp.com

*Counsel for Plaintiff*
*(Additional Counsel on Signature Page)*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| FREDDRICK MARSHALL, *individually and on behalf of all others similarly situated*,<br><br>Plaintiff.<br>vs.<br><br>SALESFORCE, INC.,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Freddrick Marshall brings this Class Action Complaint, individually and on behalf of all others similarly situated ("Class Members") against Salesforce, Inc., ("Salesforce"), and alleges as follows, based upon information and belief, the investigation of counsel, and the personal knowledge of Plaintiff.

## NATURE OF THE CASE

1. This case is about a data breach involving the unauthorized access and exfiltration of sensitive Personal Identifiable Information (PII), including names, addresses, dates of birth, driver's license numbers, and/or partial Social Security numbers, of millions of Class Members, including Plaintiff.

2. The defendant in this action is Salesforce, a company specializing in cloud-based data storage software and technology serving thousands of corporate clients by facilitating sales, customer service, marketing automation, e-commerce, and analytics with Class Members. During the ordinary course of its business, Salesforce stores an enormous amount of its customers' PII and generated nearly $38 billion in revenue last fiscal year. Each of the cyber incursions described below occurred because Salesforce's Data Loader portal, used by Salesforce customers to import or export Salesforce data, is easily mimicked by bad actors.[1]

3. Salesforce touts that it "***follow[s] the Shared Responsibility Model and believe[s] security is a shared responsibility between Salesforce and its customers***."[2]

4. The data breach at issue was highly preventable and perpetrated using techniques and vulnerabilities known to Salesforce well in advance.

5. Specifically, fully aware of the threats and vulnerabilities to its systems and the imminent threat of attacks on those systems, on March 12, 2025, Salesforce published a blog for its customers titled "Protect Your Salesforce Environment from Social Engineering Threats."[3] Salesforce identified the specific type of voice phishing ("vishing") attack that would soon be used against its customers and outlined five "proactive measures" it and its customers should, and ultimately did not, take to strengthen its data security and access controls.[4]

6. On June 4, 2025, Google's Threat Intelligence Group ("GTIG") echoed Salesforce's own warnings when it reported that the cybercriminal organization UNC6240, a.k.a. ShinyHunters, was using a common and well-known social-engineering vishing technique to gain unauthorized access to Salesforce's systems and databases because Salesforce failed to implement fundamental and basic security measures that could have prevented the Data Breach.[5] GTIG explained that ShinyHunters was "***a financially motivated threat cluster that specializes in voice phishing (vishing) campaigns***

---

[1] *See* https://developer.salesforce.com/tools/data-loader (last visited Oct. 22, 2025).

[2] *See* https://www.salesforce.com/blog/shared-responsibility-model/ (last visited Oct. 22, 2025).

[3] *See* https://www.salesforce.com/blog/protect-against-social-engineering/ (last visited Oct. 22, 2025).

[4] *Id.*

[5] *See* https://cloud.google.com/blog/topics/threat-intelligence/voice-phishing-data-extortion (last visited Oct. 22, 2025).

***specifically designed to compromise organizations' Salesforce instances for large-scale data theft and subsequent extortion***."[6] GTIG highlighted that "it's essential for [Salesforce] to configure and manage access, permissions, and user training according to best practices" to prevent such data security incidents.[7]

7. In approximately July and August, Salesforce's systems were breached by unauthorized cyber-attackers, and millions of customer PII was stolen as a result of these attacks (the "Salesforce Data Breach" or "Data Breach").

8. Despite warning that these attacks were imminent and promising customers that, "[a]s part of our Shared Responsibility Model, *we are committed to helping customers secure their Salesforce instances*,"[8] Salesforce did nothing to fortify its networks to prevent these attacks, or otherwise aid its customers in preparing and defending against the Data Breach beyond publishing a blog article.

9. Several Salesforce customers have been breached by the threat actors using the same foreseeable and preventable Salesforce vulnerability.[9]

10. In the aftermath of the attacks, Salesforce referred its customers to its blog post concerning social engineering security risks and offered only that "[a]s social engineering and phishing threats continue to rise, our top priority is to help customers strengthen their security posture."[10]

11. Plaintiff and Class Members have been substantially injured by Salesforce's data security failures. Plaintiff further believes that his and Class Members' PII has or will be published for sale on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyberattacks of this type.

12. As a result of the Data Breach, Plaintiff has suffered numerous injuries, including invasion of privacy, lost time and expenses mitigating the risk of data misuse, diminishment in value of his PII,

---

[6] *Id.* (emphasis added).

[7] *Id.*

[8] *See* https://www.salesforce.com/blog/shared-responsibility-model/ (last visited Oct. 22, 2025).

[9] Ionut Arghire, *Hundreds of Salesforce Customers Hit by Widespread Data Theft Campaign*, SecurityWeek, Aug. 27, 2025, available at https://www.securityweek.com/hundreds-of-salesforce-customers-hit-by-widespread-data-theft-campaign/.

[10] *See* https://status.salesforce.com/generalmessages/10001549 (last visited Oct. 22, 2025).

lost time and expenses monitoring and repairing credit, and failing to receive the benefit of the bargain reached with Salesforce.

13. Plaintiff brings this action to hold Salesforce accountable for its data security failures, enjoin its continued failure to implement basic and fundamental data security practices, and recover damages and all other relief available at law on behalf of himself and members of the classes he seeks to represent.

## PARTIES

14. Salesforce is a privately held cloud-based software company with its headquarters and principal place of business at 415 Mission Street, San Francisco, San Francisco County, California 94105. Salesforce is a for-profit company organized and incorporated under the laws of the State of Delaware.

15. Salesforce is a citizen of both California and Delaware.

16. Plaintiff Freddrick Marshall is a resident of Richland County, South Carolina and who had his PII stolen in the Salesforce Data Breach.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than one hundred putative Class Members, and minimal diversity exists because many putative Class Members, including Plaintiff, are citizens of a different state than any defendant.

18. This Court has personal jurisdiction over Salesforce because Salesforce maintains its headquarters and principal place of business is in this District. Moreover, Salesforce conducts substantial business in this District, including marketing to customers in this District and accepting and processing payments in this District, engages in the conduct at issue in this District, and/or otherwise has substantial contacts with this District and purposely avails itself of the Courts in this District.

19. Venue is proper in this District under 28 U.S.C. §§ 1391(a)(1)–(2), 1391(b)(2), and 1391(c)(2) as Defendant Salesforce's principal place of business is in this District, and a substantial part of the events giving rise to the claims emanate from activities within this District.

## DIVISIONAL ASSIGNMENT

20. Assignment to the San Francisco Division of this Court is proper because Salesforce's principal place of business is in San Francisco, California.

## FACTUAL ALLEGATIONS

### I. SALESFORCE'S BUSINESS

21. Salesforce was founded in San Francisco in 1999 with a goal of making customer relations management ("CRM") tools accessible to businesses by "deliver[ing] software over the internet (what we now call the cloud) instead of traditional on-premise installations."[11]

22. Today, Salesforce touts itself as "the #1 AI CRM, where humans with agents drive customer success together with AI, data, and Customer 360 apps on one platform."12 Salesforce's business model is made possible by the "Data Cloud, which brings together all your data into unified profiles, while keeping it secure."13 Salesforce's CRM tools bring "teams together around a single shared view of each customer's data, accessible to every employee . . . ."14

23. Salesforce explains that it "works by unifying all of your customer data on one platform to provide a single shared view of your customer, accessible to any member of any department at any time."15

24. Salesforce's customers store the PII of their customers and/or employees on Salesforce's platform through the use of Salesforce's Data Loader among other offered services and software.

25. Salesforce's marketing demonstrates that it is well aware that data security is a key component of the services it provides to its customers. The following examples illustrate how Salesforce markets and highlights the strength of its data security practices to entice customers to use Salesforce's

[11] *See* https://www.linkedin.com/pulse/evolution-salesforce-timeline-from-1999-2024-oaktreesoft-fhmkc#:~:text=Salesforce%20was%20founded%20in%201999,of%20traditional%20on%2Dpremise%20installations (last visited Oct. 22, 2025).

[12] *See* https://www.salesforce.com/blog/what-does-salesforce-do/#:~:text=Products-,Products,Partner%20Apps%20&%20Experts (last visited Oct. 22, 2025).

[13] *Id.* (emphasis added).

[14] *Id.* (emphasis added).

[15] *Id.* (emphasis added).

products and services as well as its awareness of industry guidance and regulations that set standards for effective data security practices:

a. Salesforce acknowledges that "data is the fuel of modern business . . . ."[16]

b. Salesforce recognizes that "***Security, privacy, and compliance are critical to every business***. To provide customers with the most secure solutions possible, ***Salesforce builds security into everything we do***.[17]

c. Salesforce claims that its "***Data Cloud keeps your data secure*** with zero copy integration, pulling everything into unified profiles without copying or moving it."[18]

d. Salesforce advertises that its Shield 2.0 product will safeguard customers' "most important asset: critical and sensitive data" by "[p]roactively defend[ing] against internal and external threats . . . ."[19] Salesforce further claims that Shield 2.0 provides "comprehensive security for critical data in Salesforce" and allows customers to "get a real-time pulse on who has access to what data, when."[20]

e. Salesforce advertises that its masking and seeding products will help customers comply with privacy laws by "***minimizing the risk of data leaks, breaches***, and noncompliance fines."[21]

- Salesforce advertises that its privacy center products will help customers comply with the General Data Protection Regulation by "de-identify[ing] sensitive data in production [and] delet[ing] excess data . . . ."[22]

- Salesforce advertises that its Security Center 2.0 product will "[q]uickly identify misconfigurations and incorrect user permissions, eliminating any gaps in your org's security posture."[23]

- Salesforce advertises that its Salesforce Mobile App Plus product "ensures

---

[16] *Id.*

[17] *See* https://www.salesforce.com/blog/shared-responsibility-model/ (emphases added) (last visited Oct. 22, 2025).

[18] *See* https://www.salesforce.com/blog/what-does-salesforce-do/#:~:text=Products-,Products,Partner%20Apps%20&%20Experts (last visited Oct. 22, 2025) (emphasis added).

[19] *See* https://www.salesforce.com/platform/shield/ (last visited Oct. 22, 2025).

[20] *Id.*

[21] *See* https://www.salesforce.com/platform/data-masking/ (last visited Oct. 22, 2025) (emphasis added).

[22] *See* https://www.salesforce.com/platform/privacy-center/ (last visited Oct. 22, 2025).

[23] *See* https://www.salesforce.com/platform/security-center/ (last visited Oct. 22, 2025).

robust security protocols, providing peace of mind."[24]

- Salesforce's Privacy Policy represents "[t]rust is our #1 value. ***Salesforce's top priority is the security and privacy of the data that we are entrusted to protect***."[25]

- Salesforce's Privacy Policy also represents that "our cloud services are ***designed to help customers comply with privacy laws*** around the world."[26]

- Salesforce's Privacy Policy also represents that "[***w]e take appropriate precautions*** including organizational, technical, and physical measures ***to help safeguard against*** accidental or unlawful destruction, loss, alteration, and ***unauthorized disclosure of, or access to, the Personal Data we process or use***."[27]

- Salesforce claims that "***[w]e protect your data at all times***, using strong security measures that are regularly verified by internal safeguards and external auditors."[28]

f. In its support for a comprehensive federal data privacy law to protect U.S. consumers in 2022, Salesforce "***recognize[d] privacy as a fundamental human right and business imperative***."[29]

26. During the ordinary course of its business (primarily through the operation of its cloud-based databases), Salesforce receives the PII of individuals, including Plaintiff and Class Members, from its customers. With respect to the protection of this data Salesforce acknowledges that ***"Cybersecurity is a shared responsibility between a provider and their customers. While Salesforce builds enterprise-grade security into every part of our platform, customers play a vital role in protecting their data — especially amid a recent rise in sophisticated social engineering and phishing attacks targeting Salesforce customers."***[30]

---

[24] *See* https://www.salesforce.com/platform/mobile-app-builder/ (last visited Oct. 22, 2025).

[25] *See* https://www.salesforce.com/company/legal/privacy/ (emphasis added) (last visited Oct. 22, 2025).

[26] *Id.* (emphasis added).

[27] *Id.* (emphasis added).

[28] *See* https://www.salesforce.com/privacy/overview/ (emphasis added) (last visited Oct. 22, 2025).

[29] *See https*://www.salesforce.com/news/stories/salesforce-renews-call-for-us-privacy-law/#:~:text=To%20protect%20people%2C%20promote%20trust,that%20interoperates%20with%20global%20standards (last visited Oct. 22, 2025).

[30] *See* https://www.salesforce.com/blog/protect-against-social-engineering/ (last visited Oct. 22, 2025).

27. Because cloud-based databases and software applications like those developed and used by Salesforce and its customers are prime targets for cybercriminals due to the volume of data they house and transfer, Salesforce knew or should have known of the risks of a potential data breach. One recent report has highlighted the risks presented specifically by cloud storage as follows:[31]

> It is estimated that more than 60% of the world's corporate data is stored in the cloud. ***That makes the cloud a very attractive target for hackers. In 2023, over 80% of data breaches involved data stored in the cloud.*** That is not just because the cloud is an attractive target. In many cases, ***it is also an easy target due to cloud misconfiguration*** – that is, companies unintentionally misuse the cloud, such as allowing excessively permissive cloud access, having unrestricted ports, and use unsecured backups.

28. Salesforce's determines how customers' PII is stored and configured by creating unique profiles via its Data Cloud service, which brings data Salesforce collects about customers from different sources "into a single model, providing a comprehensive 360-degree view of … customers" and allows Salesforce to segment audiences and provide insights to its own customers. [32]

29. Salesforce encourages its customers to store their own employees' and customers' PII on Salesforce's cloud-based software, network, and/or products.

## II. THE DATA BREACH

30. Salesforce knew of the risk that vishing schemes posed to its customers. On March 12, 2025, Salesforce published a blog on its website for its numerous customers titled "Protect Your Salesforce Environment from Social Engineering Threats."[33] The blog identified the precise scheme employed by ShinyHunters to perpetrate the Data Breach.

31. Specifically, Salesforce explained, **"*Threat actors have been observed employing various social engineering tactics, including voice phishing (i.e., "vishing"), to impersonate members of an IT Support team over the phone. They have been reported luring our customers' employees and third-party support workers to phishing pages designed to steal credentials and MFA tokens or prompting***

---

[31] https://hbr.org/2024/02/why-data-breaches-spiked-in-2023 (emphasis added) (last visited Oct. 22, 2025) (emphases added).

[32] https://help.salesforce.com/s/articleView?id=000372588&type=3 (last accessed December 28, 2025).

[33] *See* https://www.salesforce.com/blog/protect-against-social-engineering/ (last visited Oct. 22, 2025).

***users to navigate to the login.salesforce[.]com/setup/connect page in order to add a malicious connected app. In some cases, we have observed that the malicious connected app is a modified version of the Data Loader app published under a different name and/or branding.*** Once the threat actor gains access to a customer's Salesforce account or adds a connected app, they use the connected app to exfiltrate data."[34]

32. Salesforce identified five steps customers should take to fortify their networks and systems from this precise vishing attack: (1) restrict network access through IP addresses and login ranges to customers' enterprise and VPN network; (2) implement the principle of least privilege and "Grant users only the permissions they need to do their jobs — no more, no less"; (3) enable multi-factor authentication because "*MFA adds an extra layer of defense, particularly against phishing attacks* . . . ."; (4) use the suite of security tools available in Salesforce Shield; and (5) add a security point of contact "To ensure that we can reach your organization in the case of a security event . . . ."[35]

33. By June 4, 2025, GTIG outlined the common and well-known social-engineering "voice phishing" techniques ShinyHunters was using to gain unauthorized access to Salesforce's systems and databases.[36] GTIG highlighted that "it's essential for customers to configure and manage access, permissions, and user training according to best practices" in order to prevent such data security incidents.[37] GTIG specifically warned that "ShinyHunters extortion group [was] conducting social engineering attacks against multi-national companies to steal data from organizations' Salesforce platforms."[38] And that "The extortion involves calls or emails to employees of the victim organization demanding payment in bitcoin within 72 hours."[39]

34. GTIG laid out the vishing scheme being used in painstaking detail: "UNC6040 has demonstrated repeated success in breaching networks by having its operators impersonate IT support

---

[34] *Id.* (emphasis added).

[35] *Id.* (emphasis added).

[36] *See* https://cloud.google.com/blog/topics/threat-intelligence/voice-phishing-data-extortion (last visited Oct. 22, 2025).

[37] *Id.*

[38] *See* https://www.bleepingcomputer.com/news/security/google-hackers-target-salesforce-accounts-in-data-extortion-attacks/ (last visited Oct. 22, 2025).

[39] *Id.*

personnel in convincing telephone-based social engineering engagements. This approach has proven particularly effective in tricking employees, often within English-speaking branches of multinational corporations, into actions that grant the attackers access or lead to the sharing of sensitive credentials, ultimately facilitating the theft of organization's Salesforce data."[40] GTIG further explained that "A prevalent tactic in UNC6040's operations involves deceiving victims into authorizing a malicious connected app to their organization's Salesforce portal. This application is often a modified version of Salesforce's Data Loader . . . ."[41]

35. GTIG connected the dots back to Salesforce's blog post explaining that "During a vishing call, the actor guides the victim to visit Salesforce's connected app setup page to approve a version of the Data Loader app with a name or branding that differs from the legitimate version. This step inadvertently grants UNC6040 significant capabilities to access, query, and exfiltrate sensitive information directly from the compromised Salesforce customer environments. *This methodology of abusing Data Loader functionalities via malicious connected apps is consistent with recent observations detailed by Salesforce in their guidance on protecting Salesforce environments from such threats*."[42] GTIG expressly warned that ShinyHunters' attacks were targeting large companies that already used a Salesforce cloud-based CRM platform.[43] GTIG explained that ShinyHunters "may be preparing to escalate their extortion tactics by launching a data leak site (DLS). These new tactics are likely intended to increase pressure on victims . . . ."[44] GTIG warned that ShinyHunters' lateral movement through Salesforce customers' systems were not limited to Salesforce environments explaining that "Upon obtaining access, UNC6040 has been observed immediately exfiltrating data from the victim's Salesforce environment using Salesforce's Data Loader application. Following this initial data theft, ***UNC6040 was observed leveraging end-user credentials obtained through credential harvesting or vishing to move laterally through victim networks, accessing and exfiltrating data from the victim's accounts on other cloud platforms such as***

[40] *Id.*
[41] *Id.*
[42] *Id.* (emphasis added).
[43] *Id.*
[44] *Id.*

***Okta and Microsoft 365***."[45] GITG identified almost identical steps as those identified by Salesforce that corporations that used Salesforce should implement to mitigate against this particular ShinyHunters threat.[46] Despite GTIG's and Salesforce's extensive and express warnings, its customers, including TransUnion failed to take appropriate steps to prevent the unauthorized access.

36. Months after GTIG's warnings, Salesforce started notifying its customers of an unauthorized cyber incursion that involved Salesforce's databases with customer information.[47] By waiting several days, Salesforce failed to notify its customers immediately following discovery of the incursion that Plaintiff and Class members' PII was involved in the Data Breach, increasing the risk of misuse of Plaintiff and Class members' data and PII.

37. Plaintiff Marshall received his breach notification letter from Salesforce customer TransUnion in September. TransUnion confirmed that nearly 4.5 million customers' personal information was exposed in the TransUnion Data Breach.[48] TransUnion confirmed that the stolen customer information included, customers' names, dates of births, and Social Security numbers.[49] In recognition of the imminent risk of identity theft and fraud, TransUnion offered affected customers credit monitoring and identity theft protection.[50]

38. Salesforce failed to take the necessary precautions to safeguard and protect Plaintiff's and Class Members' PII from unauthorized access and exploitation. The risk of cyberattacks, such as the one that occurred here, were or should have been well-known to Salesforce. Salesforce could have taken, but did not take, numerous simple measures to prevent the Data Breach. Salesforce's actions and inactions represent a flagrant disregard of the rights of Plaintiff and the Class Members.

---

[45] *Id.* (emphasis added).

[46] *Id.*

[47] https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/3dcd9b7c-bce3-4685-bffd-f728ce96e2fd.html (last visited Oct. 26, 2025).

[48] *Id.*

[49] TransUnion Data Breach Notice to Texas Attorney General, https://www.documentcloud.org/documents/26078139-transunion-breach-texas/ (last visited Oct. 26, 2025).

[50] https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/3dcd9b7c-bce3-4685-bffd-f728ce96e2fd.html (last visited Oct. 26, 2025).

## III. RELEVANT INDUSTRY STANDARDS AND REGULATIONS FOR DATA SECURITY UNITED STATES FEDERAL TRADE COMMISSION GUIDELINES

39. The United States Federal Trade Commission ("FTC") has issued numerous forms of guidance and taken enforcement actions that outline the data security industry standards applicable to Salesforce.

40. For example, the FTC's enforcement actions have established that a company's failure to maintain reasonable and appropriate data security of consumer PII violates the FTC Act's prohibition against "unfair or deceptive acts."[51]

41. In 2016, the FTC published guidance entitled *Protecting Personal Information: A Guide for Business* (the "FTC 2016 Guidance"). The FTC 2016 Guidance:

a. Stresses the importance of "[c]ontrol[ling] access to sensitive information" and expressly encourages businesses to "[c]onsider using multi-factor authentication, such as requiring the use of a password and a code sent by different methods."[52]

b. Emphasizes that companies should respond appropriately when credentials are compromised, providing that businesses should "[r]equire password changes when appropriate—for example, following a breach."

c. Instructs companies to restrict data access privileges by "[s]cal[ing] down access to data" and ensuring that "each employee should have access only to those resources needed to do their particular job."[53]

d. Warns companies that their data security practices depend on their personnel, which "includ[e] contractors" and encourages companies to "investigate [contractor] data security practices and compare their standards" and "verify compliance" with written security expectations.

e. Recommends that companies encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems and respond to security incidents.

---

[51] *See, e.g.*, *In re Cap. One Consumer Data Sec. Breach Litig.*, 488 F. Supp.3d 374, 407 (E.D. Va. 2020) (citing *F.T.C. v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015)).

[52] https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_protecting-personal-information.pdf (last visited Oct. 22, 2025).

[53] https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Oct. 22, 2025).

f. Advises companies not to maintain PI longer than necessary, not to collect more PI than necessary, to use industry-tested methods for data security, and monitor and respond to suspicious activity.

42. In 2021, the FTC amended its "Safeguards Rule" that applies to financial institutions, including retailers that issue their own credit cards to consumers and companies that bring together buyers and sellers of products and services.[54] The Safeguard Rule expressly requires covered businesses to "[i]mplement multi-factor authentication ["MFA"] for anyone accessing customer information on [the business's] system," to "[i]mplement and periodically review access controls [to] [d]etermine who has access to customer information and reconsider on a regular basis whether they still have a legitimate business need for it," and to "[i]mplement procedures and controls to monitor when authorized users are accessing customer information on your system and detect unauthorized access."[55]

43. In February 2023, the FTC published an article entitled *Security Principles: Addressing underlying causes of risk in complex systems.* The article highlighted the importance of MFA, stating that it "is widely regarded as a critical security practice because it means a compromised password alone is not enough to take over someone's account."[56]

**A. Data Breaches Are Preventable**

44. Despite the growing body of publicly available information regarding the rise of ransomware attacks, vishing schemes, and other forms of cyberattacks that compromise PII, Salesforce's approach to maintaining the privacy of Plaintiff's and Class Members' PII was inadequate, unreasonable, negligent, and reckless. Salesforce failed to use reasonable security procedures and practices appropriate to the nature of the sensitive information Salesforce was maintaining and transferring such as adequately alerting its customers concerning vishing attacks and other social engineering schemes, which caused the exposure of Plaintiff's and Class Members' PII.

---

[54] 16 C.F.R. §§ 314.2(h)(2)(i), (xiii).

[55] *See* https://www.ftc.gov/business-guidance/resources/ftc-safeguards-rule-what-your-business-needs-know (last visited Oct. 22, 2025).

[56] *See* https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/02/security-principles-addressing-underlying-causes-risk-complex-systems (last visited Oct. 22, 2025).

45. As explained by the FBI, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[57]

**B. Salesforce Acquires, Collects, and Stores Plaintiff's and Class Members' Private Information**

46. Salesforce acquires, collects, and stores a significant amount of PII belonging to Plaintiff and Class Members.

47. As a condition of utilizing or purchasing Salesforce customers such as Transunion's products and services, Plaintiff and Class Members were required to entrust their highly sensitive PII to these entities, and in turn, either directly or indirectly, to Salesforce.

48. By obtaining, collecting, and using Plaintiff's and Class Members' PII, Salesforce assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' PII from unauthorized disclosure.

49. Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII and would not have entrusted their PII to Salesforce absent a commitment to safeguard that information.

50. Upon information and belief, Salesforce promised, while collecting PII from Plaintiff and Class Members, to provide confidentiality and adequate security for its data through its applicable privacy policies and through other disclosures in compliance with statutory privacy requirements.

51. Plaintiff and Class Members relied on Salesforce to keep their PII confidential and securely maintained, to use their PII for business purposes only, and to make only authorized disclosures of their PII. The Data Breach occurred because Salesforce failed to honor its commitments.

**C. Value of Private Information**

52. The FTC defines "identity theft" as "a fraud committed or attempted using the identifying information of another person without authority."[58] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a

[57] Ransomware Prevention and Response, FBI, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited Oct. 22, 2025).
[58] 17 C.F.R. § 248.201 (2013).

specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[59]

53. The PII of individuals remains of high value to criminals, as evidenced by the prices paid for PII on the dark web. Numerous sources cite dark-web pricing for stolen identity credentials.[60]

54. The PII compromised in the Data Breach is significantly more valuable than the loss of, for example, payment card information at the point of sale in a retailer data breach because, there, victims can cancel or close payment card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—names, dates of birth, and Social Security numbers.

55. Among other forms of fraud, identity thieves can obtain driver's licenses, government benefits, medical services, and housing, and even provide false information to police.

56. The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when the harm occurs versus when it is discovered and also between when the PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[61]

57. When combined with other publicly available data, any PII element can be used to build full identity profiles, known as "Fullz" packages, which are frequently exploited in financial fraud schemes. "Fullz" is fraudster-speak for data that includes a victim's information, including name, address, SSN, date of birth, and more.

---

[59] *Id.*

[60] *See* https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Oct. 22, 2025).

[61] *See* https://www.gao.gov/assets/gao-07-737.pdf (last visited Oct. 22, 2025).

58. With Fullz packages, cybercriminals can cross-reference two (or more) sources of PII to marry unregulated data available elsewhere (e.g., address or phone number) to criminally stolen data to assemble shockingly accurate and complete dossiers on individuals.

59. Compromised PII, whether alone or as part of a Fullz package, is highly valuable to cybercriminals, who can use it to engage in a wide range of fraudulent activities, including committing unemployment insurance fraud, opening unauthorized financial accounts, and applying for government benefits.

60. This type of identity theft renders any compromised data—including seemingly innocuous PII, such as name and contact information—valuable. In the wrong hands, up-to-date names, addresses, phone numbers, and email addresses can be used to update, validate, and verify Fullz packages, which can then be used for nefarious purposes.

61. For example, a criminal actor can use an up-to-date Fullz package to bypass identity verification tools—which are often used in financial transactions (like loan applications), background checks, etc.—without detection. In a typical identity verification system, a user submits their PII, like their name, addresses, or date of birth. That customer-submitted PII is then cross-checked against "a trusted data set," including those from "credit bureaus, official government documents or mobile operator databases."

62. Thus, with an up-to-date Fullz package—which might include seemingly harmless information, like the identity theft victim's name and current address—a cybercriminal has the victim's up-to-date PII, which will match the victim's information from trusted data sources, like the credit bureaus. With this information, the criminal can then successfully pass identity verification systems without raising any red flags. In this way, Fullz packages, which are made possible by up-to-date and compromised elements of PII, enable fraudsters to carry out various forms of identity theft, including taking out fraudulent loans.

63. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Class Members are incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

**D. Industry Standards Specific to Cloud Data Storage**

64. In addition to the general data security standards described above, numerous authorities have issued guidance specific to cloud data storage, defining the roles and responsibilities of cloud service providers (like Salesforce).

**i. Governmental Authorities**

65. In March 2023, the FTC issued a Request for Information seeking public comment on "Business Practices of Cloud Computing Providers that Could Impact Competition and Data Security."[62] After reviewing over 100 public comments on the issue, the FTC published a report in November 2023 titled, *Cloud Computing RFI: What we heard and learned.* The report expressly flagged the room for improvement in cloud security as follows: "[A] a number of commenters argued there is a great deal of room for improvement in cloud security; that default security configurations could be better; and that the "shared responsibility" model for cloud security often lacks clarity, which can lead to situations where neither the cloud provider nor the cloud customer implements necessary safeguards."[63]

66. In March 2024, the U.S. National Security Agency ("NSA") and Cybersecurity & Infrastructure Agency ("CISA") issued a joint publication titled, *Use Secure Cloud Identity and Access Management Practices.* The publication warned, "[a]s organizations continue to migrate to using cloud environments, these environments are becoming increasingly valuable targets for malicious cyber actors[.]" The publication made numerous recommendations relevant to MFA and rotating credentials :

> a. **Multifactor authentication.** Single-factor authentication (e.g., password or PIN only) based account access is susceptible to credential theft, forgery, and reuse across multiple systems. Cloud accounts are generally globally accessible; thus they are more susceptible to certain types of single-factor authentication weaknesses. Multifactor authentication (MFA) boosts account security, better resisting compromise by enhancing user verification methods. MFA requires two or more factors for login: something the user knows, has, or is. Typically this is implemented using a password and a second factor usually based on a randomly seeded numeric token, a biometric option (such

[62] https://www.ftc.gov/news-events/news/press-releases/2023/03/ftc-seeks-comment-business-practices-cloud-computing-providers-could-impact-competition-data (last visited Oct. 22, 2025).

[63] https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/11/cloud-computing-rfi-what-we-heard-learned (last visited Oct. 22, 2025).

> as a fingerprint or facial recognition), or a physical token (unique hardware-based identifier: smartcard, Common Access Card, etc.).

67. Also in March 2024, NSA separately issued a publication titled, *NSA's Top Ten Cloud Security Mitigation Strategies.* The publication emphasized the importance of MFA, credential rotation, and restricted allow lists as follows for cloud data service providers as follows:[64]

> Proper identity and access management (IAM) are critical to securing cloud resources. Malicious actors can compromise accounts using phishing techniques, exposed credentials, or weak authentication practices to gain initial access into cloud tenants. They can also exploit overly broad access control policies to penetrate further into the environment, gaining access to sensitive resources. To prevent this, cloud users should use secure authentication methods such as phishing-resistant multifactor authentication (MFA) and properly managed temporary credentials. Access control policies should be carefully configured to ensure users are granted the least privileges necessary. Separation of duties should be implemented to protect especially sensitive operations and resources.

**ii. Industry Standards**

68. The PCI Data Security Council issued an April 2018 supplement to the PCI DSS, titled Cloud Computing Guidelines.[65] The PCI Cloud Computing Guidelines again emphasize the importance of MFA, providing: "PCI DSS Requirement 8.2.2 requires multi-factor authentication for all remote network access to the CDE [cardholder data environment], and when public cloud services are part of a Customer's CDE, all such access will be considered remote access and will require multi-factor authentication.

69. The Guidelines include a section titled Intrusion Detection Systems (IDS) / Intrusion Prevention Systems (IPS), which provides: "As the Customer's access to network level data can be severely restricted in cloud environments, the responsibility for tracking intrusions at the network layer will often reside with the Provider, as the only entity that has sufficient privileges to do this across the underlying infrastructure." The guidelines go on to note that for SaaS providers such as Salesforce: "Since

---

[64] https://media.defense.gov/2024/Mar/07/2003407860/-1/-1/0/CSI-CloudTop10-Mitigation-Strategies.PDF (last visited Oct. 22, 2025).

[65] https://listings.pcisecuritystandards.org/pdfs/PCI_SSC_Cloud_Guidelines_v3.pdf (last visited Oct. 22, 2025).

customer access to low level network traffic is impossible, it must rely on Providers for IDS/IPS, monitoring and alerting."[66]

70. ISO/IEC 27017 is an international standard that "provides controls and implementation guidance for both cloud service providers and cloud service customers."[67] Control 9.2.3 specifically highlights that cloud service providers (like Salesforce) should provide MFA capabilities as follows:

> The cloud service provider should provide sufficient authentication techniques for authenticating the cloud service administrators of the cloud service customer to the administrative capabilities of a cloud service, according to the identified risks. For example, the cloud service provider can provide multi-factor authentication capabilities or enable the use of third-party multi-factor authentication mechanisms.

## IV. SALESFORCE OWED A DUTY OF CARE TO PLAINTIFF AND CLASS MEMBERS.

71. Plaintiff's and Class Members' PII was stored on Salesforce's platforms, networks, systems or products at the time of the Data Breach.

72. Salesforce owed common law duties to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII in Salesforce's possession from being compromised, accessed, stolen, or misused by unauthorized parties.

73. Salesforce's duty of reasonable care is established by the nature of its business, which is made possible by the "Data Cloud, which brings together all of [customers'] data into unified profiles, ***while keeping it secure***."[68] In offering and undertaking these services to customers, Salesforce had a duty to exercise reasonable care to safeguard Plaintiff's and Class Members' PII because it was foreseeable that failure to do so would cause them injury.

---

[66] *See* https://listings.pcisecuritystandards.org/pdfs/PCI_SSC_Cloud_Guidelines_v3.pdf (last visited Oct. 22, 2025).

[67] https://www.amnafzar.net/files/1/ISO%2027000/ISO%20IEC%2027017-2015.pdf (last visited Oct. 22, 2025).

[68] *See* https://www.salesforce.com/blog/what-does-salesforce-do/#:~:text=Products-,Products,Partner%20Apps%20&%20Experts (last visited Oct. 22, 2025).

74. Salesforce's duty of reasonable care is established by governmental regulations and industry guidance establishing industry standards for data security to safeguard the PII it stored.

75. Salesforce's duty of reasonable care is also established by its own marketing statements and Privacy Policy, which hold out its secure provision of services.

76. Salesforce's duty of reasonable care is also established by relevant common law.

77. Salesforce breached its duties to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII by failing to implement adequate data security practices, which caused the Data Breach.

78. Salesforce was negligent and breached its duty of care to Plaintiff and Class Members to protect their PII from exploitation via its customers' use of Salesforce's cloud-based platforms, software and databases.

79. Salesforce's breach of its duty of care caused the Data Breach, because had Salesforce lived up to its shared responsibility commitments to its customers, the Data Breach could have been prevented.

80. Salesforce's data security failings also constitute an unfair trade practice. As discussed above, the FTC's enforcement actions have established that a company's failure to maintain reasonable and appropriate data security of PII violates the FTC Act's prohibition on "unfair and deceptive acts."

81. Salesforce's breach of its duty of care and engagement in unfair trade practices caused injury to Plaintiff and Class Members.

82. Salesforce is liable for the injuries suffered by Plaintiff and Class Members by virtue of its role as the proprietary owner and administrator of the cloud-based software, platforms and databases, which were used to facilitate the transfer of and store the data of its affected customers, including TransUnion, as well its shared responsibility with its customers to protect PII.

**A. Plaintiff and Class Members have and will continue to suffer injuries because of the Data Breach.**

83. Plaintiff and Class Members have and will continue to suffer the following forms of injury fairly traceable of the Data Breach.

84. The Data Breach's disclosures of Plaintiff's and Class Members' PII has created a substantial risk that their data will be misused. That cybercriminals now control that data demonstrates this risk.

85. Plaintiff and Class Members have and will continue to reasonably expend significant time and costs mitigating the substantial risk of data misuse. These mitigation steps include Plaintiff and Class Members now expending time and effort to place "freezes" and "alerts" with credit reporting agencies, research and engage credit monitoring services, contacting their financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

86. Plaintiff and Class Members have and may suffer lost property value of their PII when Salesforce allowed their PII to fall into the hands of cybercriminals, who could—and likely will—freely sell or distribute it at any time.

87. Plaintiff and Class Members have also been injured by an invasion of their privacy rights. The disclosure of their PII to cybercriminals and potentially others if and when the cybercriminals disclose it on the dark web involves PII whose private nature was compromised by the Data Breach.

88. In addition, Plaintiff and Class Members have or may suffer emotional distress and anxiety resulting from the Data Breach and fear the substantial risk of identity theft and loss of privacy. Plaintiff and Class Members understand that their PII cannot now be clawed back from the dark web.

## V. PLAINTIFF MARSHALL'S EXPERIENCE

89. Mr. Freddrick Marshall is a customer of TransUnion who has an online account with TransUnion and utilizes its credit-reporting services. TransUnion is one of Salesforce's customers that uses Salesforce's CRM, Data Cloud, and other cloud services.

90. Upon information and belief, Mr. Marshall's PII was stolen from Salesforce's systems, networks, and/or software in the Data Breach.

91. Salesforce possessed Mr. Marshall's PII before, during, and after the Data Breach.

92. Because of the Data Breach, Mr. Marshal's confidential PII is in the hands of cybercriminals. As such, Mr. Marshall and other Class Members are at imminent risk of identity theft and fraud.

93. As a result of the Data Breach, Mr. Marshall must expend hours of his time and suffer loss of productivity addressing and attempting to ameliorate and mitigate the future consequences of the Data Breach, including investigating the Data Breach, investigating how best to ensure that he is protected from identity theft, and reviewing account statements, credit reports, and/or other information.

94. Mr. Marshall places significant value on the security of his PII and does not readily disclose it. Mr. Marshall has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

95. Mr. Marshall has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. Such a risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the PII compromised by the Data Breach. Additionally, Mr. Marshall has experienced a sharp increase in targeted phishing emails that incorporate information he provided to Salesforce. And, mere weeks after receiving notification of the Data Breach, Mr. Marshall was informed by the fraud department of his debit card issuer that an unauthorized user attempted to use his debit card. Mr. Marshall has a continuing interest in ensuring that his PII, which, upon information and belief, remains in the possession of Salesforce, is protected and safeguarded from future data breaches. Absent court intervention, Mr. Marshall and Class Members' PII will be wholly unprotected and at-risk of future data breaches.

96. Mr. Marshall suffered actual injury as a result of the unauthorized access and disclosure of his PII in the Data Breach including, but not limited to: (i) invasion of privacy; (ii) disclosure and/or theft of his PII; (iii) lost or diminished value of his PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) nominal damages; and (vi) the continued and certainly increased risk to his PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Salesforce's possession and is subject to further unauthorized disclosures so long Salesforce fails to undertake appropriate and adequate measures to protect his PII.

97. The Data Breach has caused Mr. Marshall to suffer fear, anxiety, and stress, which has been compounded by the fact that Salesforce has still not informed him of key details about the Data Breach.

## VI. CLASS ACTION ALLEGATIONS

98. Plaintiff brings this action on his own behalf and on behalf of the following Class:

> **Salesforce Class.** All individuals residing in the United States whose PII was compromised in the Data Breach.

99. Plaintiff also brings this action on his own behalf and on behalf of the following "South Carolina Salesforce Subclass":

> **South Carolina Salesforce Subclass**: All individuals residing in South Carolina whose PII was compromised in the Data Breach.

100. Excluded from each of the Classes are Salesforce's officers, directors, and any entity in which Salesforce has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Salesforce. Excluded also from each of the Classes are members of the judiciary to whom this case is assigned, their families and members of their staff.

101. Plaintiff reserves the right to amend or modify the definition of the Classes or create additional subclasses as this case progresses.

102. **Numerosity.** The members of the Classes are so numerous that joinder of all Class Members is impracticable. Public reporting presently indicates that there are dozens of impacted companies, with millions of customers and employees, whose data was implicated in the Data Breach.

103. **Commonality.** There are questions of fact and law common to each of the Classes, which predominate over individualized questions. These common questions of law and fact include, but are not limited to:

a. Whether Salesforce had a duty to protect the PII of Plaintiff and Class Members and whether it breached that duty.

b. Whether Salesforce knew or should have known that its data security practices were deficient.

c. Whether Salesforce's data security systems were consistent with industry standards before the Data Breach.

d. Whether Plaintiff and Class Members are entitled to actual damages, punitive damages, treble damages, statutory damages, nominal damages, and/or injunctive relief.

104. **Typicality**. Plaintiff's claims are typical of those of other Class Members because Plaintiff's PII, like that of every other Class Members', was compromised in the Data Breach.

105. **Adequacy of Representation.** Plaintiff will fairly and adequately represent and protect the interests of the Class Members. Plaintiff's Counsel are competent and experienced in litigating class actions, including data-breach class actions specifically.

106. **Predominance.** Salesforced engaged in a common course of conduct toward Plaintiff and Class Members, whose data was stored on the same Salesforce software and products and was unlawfully accessed in the same manner. The common issues arising from Salesforce's conduct affecting Class Members predominate over any individualized issues. Adjudication of these common issues in a single action will advance judicial economy.

107. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the claims of the Classes. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find the cost of litigating their individual claims to be prohibitively high and therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications as to individual Class Members, which would establish incompatible standards of conduct for Salesforce. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects each Class Member's rights.

108. Class certification is also appropriate under Rules 23(b)(1), (b)(2), and/or (c)(4) because:

a. The prosecution of separate actions by individual member of the Classes would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Salesforce.

b. The prosecution of separate actions by individual Class members would create a risk of adjudications that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests.

c. Salesforce has acted or refused to act on grounds generally applicable to the Classes, making injunctive and corresponding declarative relief appropriate with respect to the classes as a whole; and

d. The claims of Class members comprise of common issues whose resolution in a class trial would materially advance this litigation.

109. Finally, all members of the proposed Classes are readily ascertainable. Salesforce has access to the names and contact information of all Class Members affected by the Data Breach.

## VII. CAUSES OF ACTION

### A. Count I: Negligence

**(On behalf of Salesforce Class)**

110. Plaintiff repeats and re-alleges the factual allegations above as if fully set forth herein.

111. Salesforce owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, and deleting their PII in its possession from being compromised, stolen, or misused by unauthorized persons.

112. Plaintiff and Class Members entrusted Salesforce with their PII with the understanding that Salesforce would safeguard their PII.

113. Salesforce had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class Members could and would suffer if their PII were wrongfully disclosed.

114. By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Salesforce had a duty of care to use reasonable means to secure and safeguard its computer property—and Plaintiff and Class Members' PII held within it—to prevent disclosure of the information, and to safeguard the information from theft.

115. Specifically, this duty included, among other things: (a) implementing industry standard data security safeguards to protect the PII of Plaintiff and Class Members; (b) maintaining, testing, and monitoring relevant security systems to ensure that PII was adequately secured and protected; (c) implementing intrusion detection systems and timely notifying customers of suspicious intrusions; (d) ensuring its software products on which Plaintiff's and Class Members' PII was stored and maintained were adequately and reasonably secure and not vulnerable to exploitation; and (e) adequately notifying Plaintiff and Class Members about the types of data that were compromised in the Data Breach.

116. Salesforce's duties to use reasonable care arose from several sources, including those set out below.

117. Salesforce had a duty to employ reasonable security measures under Section 5 of the FTCA, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

118. Salesforce had a common law duty to prevent foreseeable harm to others. This duty existed because Salesforce stored valuable PII that is routinely targeted by cybercriminals. Plaintiff and Class Members were the foreseeable and probable victims of any breach resulting from Salesforce's inadequate data security practices.

119. Salesforce further assumed a duty of reasonable care in making representations in marketing materials and its Privacy Policies, Notices and Statements concerning data security.

120. Moreover, Salesforce had a duty to promptly and adequately notify Plaintiff and Class Members of the Data Breach.

121. Salesforce had and continue to have a duty to adequately disclose that the PII of Plaintiff and Class Members within Salesforce's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff and Class Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

122. Salesforce breached its duties owed to Plaintiff and Class Members by failing to maintain adequate data security practices that conformed with industry standards and were therefore negligent. The specific negligent acts and omissions committed by Salesforce include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and Class Members' PII;

b. Failing to adequately monitor the security of its networks and systems;

c. Failure to adequately train its customers and/or its employees to maintain reasonable data security safeguards;

d. Allowing unauthorized access to Plaintiff's and Class Members' PII;

e. Failing to detect in a timely manner that Plaintiff's and Class Members' PII had been compromised;

f. Failing to timely and adequately notify Plaintiff and Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages; and

g. Failing to ensure its software was adequately and reasonably secure to protect the PII Plaintiff and Class Members entrusted to it.

123. But for Salesforce negligence, the PII of Plaintiff and Class Members would not have been stolen by cybercriminals in the Data Breach.

124. Salesforce violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Salesforce's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and Class Members.

125. Plaintiff and Class Members are within the class of persons that the FTC Act was intended to protect.

126. The harm that occurred because of the Data Breach is the type of harm the FTC Act was intended to guard against.

127. Salesforce's violation of Section 5 of the FTC Act constitutes negligence.

128. The FTC has pursued enforcement actions against businesses, which, because they failed to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and Class Members.

129. A breach of security, unauthorized access, and resulting injury to Plaintiff and Class Members was reasonably foreseeable, particularly considering Salesforce's inadequate security practices.

130. Plaintiff and Class Members were the foreseeable and probable victims of any consequences of Salesforce's inadequate security practices and procedures. Salesforce knew or should have known of the inherent risks in collecting and storing the PII of Plaintiff and Class Members, the critical importance of adequately safeguarding that PII, and the necessity of encrypting PII stored on its systems.

131. It was therefore foreseeable that failing to adequately safeguard Plaintiff's and Class Members' PII would result in one or more types of injuries to Class Members.

132. There is a close causal connection between Salesforce's failure to implement security measures to protect Plaintiff's and Class Members' PII and the harm, or risk of imminent harm, suffered by Plaintiff and Class Members. The PII of Plaintiff and Class Members was lost and accessed as the proximate result of Salesforce's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

133. As a direct and proximate result of Salesforce's breach of its duties, Plaintiff and Class Members have suffered injuries in fact including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of their PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) actual misuse of the compromised data consisting of an increase in spam calls, texts, and/or emails; (vii) nominal damages; and (viii) the continued and certainly increased risk to their PII, which: remains (a) unencrypted and available for unauthorized third parties to access and abuse; and (b) backed up in Salesforce's possession and is subject to further unauthorized disclosures so long as Salesforce fails to undertake appropriate and adequate measures to protect their PII.

134. As a direct and proximate result of Salesforce's negligence, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and harm, including, but not limited to, anxiety, emotional distress, concern for loss of privacy, and other economic and non-economic losses.

135. Plaintiff and Class Members had no ability to protect their PII that was in, and remains in, Salesforce's possession.

136. Salesforce was in a position to protect against the harm suffered by Plaintiff and Class Members because of the Data Breach.

137. Salesforce's duty extended to protecting Plaintiff and Class Members from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized a specific duty to reasonably safeguard PII.

138. Salesforce has admitted that the PII of Plaintiff and Class Members was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

139. As a direct and proximate result of Salesforce's negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

**B. Count II: Unjust Enrichment (On behalf of Plaintiff and Salesforce Class Members)**

140. Plaintiff repeats and re-alleges the factual allegations above as if fully set forth herein.

141. Plaintiff brings this claim under the law of the state of Illinois.

142. Plaintiff brings this Count in the alternative to Count II above with respect to TransUnion.

143. Upon information and belief, Salesforce funds any data security measures it implements entirely from its general revenues, including from money they make (including that supplied by contractual payments directly or indirectly by Plaintiff and Class Members) based upon representations of protecting PII.

144. Thus, there is a direct nexus between money paid to Salesforce and the requirement that Salesforce keeps PII confidential and protected.

145. Plaintiff and Class Members paid Salesforce, directly or indirectly, a certain sum of money, which was used to fund any data security measures implemented by Salesforce.

146. As such, a portion of the payments made by Plaintiff and Class Members (or made on their behalf) is to be allocated to and used to provide a reasonable and adequate level of data security, the amount of which is known to Salesforce.

147. Protecting PII is integral to Salesforce's businesses. Without PII, Salesforce would be unable to provide the business services that comprise Salesforce's core businesses.

148. Plaintiff's and Class Members' PII has monetary value. Thus, Plaintiff and Class Members conferred a monetary benefit on Salesforce.

149. Salesforce collected and stored the PII provided by Plaintiff and Class Members to Salesforce. In exchange, Plaintiff and Class Members should have received from Salesforce the services that comprise Salesforce's businesses and should have had the PII protected with adequate data security.

150. Salesforce knew that Plaintiff and Class Members conferred a benefit upon them and accepted and retained that benefit by accepting and retaining the PII entrusted to them. Salesforce profited from the PII and used the PII for business purposes.

151. Salesforce failed to secure the PII and, therefore, did not fully compensate Plaintiff and Class Members for the value that the PII provided.

152. Had Plaintiff and Class Members known that Salesforce would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure the PII, they would not have entrusted the PII to Salesforce or obtained services from Salesforce.

153. Plaintiff and Class Members have no adequate remedy at law.

154. Salesforce enriched itself by saving the costs they reasonably should have expended on data security measures to secure the PII. Instead of providing a reasonable level of security that would have prevented the Data Breach, Salesforce instead calculated to increase its own profit at the expense of Plaintiff and Class Members by using cheaper, ineffective security measures and diverting those funds to its own profit. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Salesforce's decisions to prioritize its own profits over the requisite data security and the safety of Plaintiff's and Class Members' PII.

155. Under the circumstances, it would be unjust for Salesforce to be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon them.

156. As a direct and proximate result of Salesforce's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of their PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) actual misuse of the compromised data consisting of an increase in spam calls, texts, and/or emails; (vii) nominal damages; and (viii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Salesforce's possession and is subject to further unauthorized disclosures so long as Salesforce fails to undertake appropriate and adequate measures to protect their PII.

157. Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Salesforce and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Salesforce from its wrongful conduct. This can be accomplished by establishing a constructive trust from which Plaintiff and Class Members may seek restitution or compensation.

158. Because Plaintiff and Class Members may not have an adequate remedy at law against Salesforce, they plead this claim for unjust enrichment in addition to or in the alternative to other claims pleaded herein.

**C. Claim IV: South Carolina Data Breach Security Act, S.C. Code Ann. §§ 39-1-90, *et seq*. (On Behalf the South Carolina Salesforce Subclass).**

159. Plaintiff repeats and re-alleges the factual allegations above as if fully set forth herein.

160. Plaintiff brings this Count on his own behalf and on behalf of the South Carolina Salesforce Subclass.

161. Salesforce is a business that maintains computerized data or other data that includes PII in South Carolina, as defined by S.C. Code Ann. § 39-1-90(B).

162. Plaintiff and the South Carolina Salesforce Subclass members' information that was included in the Data Breach constitutes PII as covered under S.C. Code Ann. § 39-1- 90(D)(3).

163. Salesforce is required to accurately notify Plaintiff and South Carolina Subclass members following discovery or notification of a breach of its data security systems if their PII that was not rendered unusable through encryption, redaction, or other methods was, or was reasonably believed to have been, acquired by an unauthorized person, creating a material risk of harm, in the "most expedient time possible and without unreasonable delay" under S.C. Code Ann. § 39-1-90(A) and (B).

164. Because Salesforce discovered a breach of its data security system in which PII that was not rendered unusable through encryption, redaction, or other methods, was, or was reasonably believed to have been, acquired by an unauthorized person, creating a material risk of harm, it had an obligation to disclose the Data Breach in a timely and accurate fashion as mandated by S.C. Code Ann. § 39-1-90(A) and (B).

165. Salesforce knew of the vulnerabilities in its systems for months before the Data Breach, and did little to warn its customers except publish a blog post on March 12, 2025 titled "Protect Your Salesforce Environment from Social Engineering Threats."

166. Moreover, Salesforce failed to immediately notify TransUnion and other of its customers about the Data Breach following discovery of it. Salesforce learned or should have learned of the Data Breach when it occurred, on or approximately on July 28, 2025, but did not inform TransUnion of the Data Breach until July 30, 2025, which caused Plaintiff and the South Carolina Salesforce Subclass members harm by exposing their PII to unauthorized persons.

167. By failing to disclose the Data Breach to its customers "immediately following discovery" of it, Salesforce violated S.C. Code Ann. § 39-1-90(B).

168. As a direct and proximate result of Salesforce's violations of of S.C. Code Ann. § 39- 1-90(B), Plaintiff and the South Carolina Subclass members were prevented from taking steps to safeguard their PII, such as placing a freeze on their credit, contacting their financial institutions, changing their passwords or other security keys, and taking other measures to protect their information.

169. Plaintiff and South Carolina Subclass Members seek relief under S.C. Code Ann. § 39-1-90(G), including actual damages, injunctive relief, and attorneys' fees.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and Class Members, request judgment against Salesforce and that the Court grant the following:

A. An Order certifying the Class and appointing Plaintiff and his Counsel to represent the Class;

B. Equitable relief enjoining Salesforce from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiff and Class Members;

C. Injunctive relief, including but not limited to injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

i. prohibiting Salesforce from engaging in the wrongful and unlawful acts described herein;

ii. requiring Salesforce to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii. requiring Salesforce to delete, destroy, and purge the PII of Plaintiff and Class Members unless Salesforce can provide the Court with reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv. requiring Salesforce to pay out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, fraud, and/or unauthorized use of their PII for Plaintiff's and Class Members' lifetimes;

v. requiring Salesforce to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of Plaintiff's and Class Members' PII;

vi. requiring Salesforce to engage independent third-party security auditors and/or penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Salesforce's systems on a periodic basis and ordering Salesforce to promptly correct any problems or issues detected by such third-party security auditors;

vii. requiring Salesforce to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii. requiring Salesforce to audit, test, and train its security personnel regarding any new or modified procedures;

ix. requiring Salesforce to segment data by, among other things, creating firewalls and controls so that if one area of Salesforce's networks is compromised, hackers cannot gain access to other portions of Salesforce's systems;

x. requiring Salesforce to conduct regular database scanning and securing checks;

xi. requiring Salesforce to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling PII, as well as protecting the PII of Plaintiff and Class Members;

xii. requiring Salesforce to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and how to respond to a breach;

xiii. requiring Salesforce to implement testing systems to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, and randomly and periodically testing employees' compliance with Salesforce's policies,

programs, and systems for protecting PII;

xiv. requiring Salesforce to implement, maintain, regularly review, and revise as necessary a threat-management program designed to appropriately monitor Salesforce's information networks for internal and external threats and assess whether monitoring tools are appropriately configured, tested, and updated;

xv. requiring Salesforce to meaningfully educate all Class Members about the threats that they face because of the loss of their confidential PII to unauthorized third parties as well as the steps affected individuals must take to protect themselves;

xvi. requiring Salesforce to implement logging and monitoring programs sufficient to track traffic to and from Salesforce's servers; and

xvii. for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Salesforce's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the Class, and to report any deficiencies with compliance of the Court's final judgment;

D. For an award of damages, including actual, nominal, consequential, and punitive damages, as allowed by law in an amount to be determined;

E. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F. For prejudgment interest on all amounts awarded; and

G. Such other and further relief as this Court may deem just and proper.

**<u>JURY TRIAL DEMANDED</u>**

Plaintiff hereby demands a trial by jury on all claims so triable.

Dated: December 31, 2025

Respectfully submitted,

By: <u>/s/ *Dena C. Sharp*</u>

Dena C. Sharp (State Bar No. 245869)
Adam E. Polk (State Bar No. 273000)
Scott Grzenczyk (State Bar No. 279309)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, California 94108
415.981.4800
dsharp@girardsharp.com
apolk@girardsharp.com
scottg@girardsharp.com

Jason L. Lichtman (pro hac vice forthcoming)
Michael J. Miarmi (pro hac vice forthcoming)
Margaret M. Becko (pro hac vice forthcoming)
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013
212.355.9500
jlichtman@lchb.com
mmiarmi@lchb.com
mbecko@lchb.com

James J. Pizzirusso (pro hac vice forthcoming)
Nick Murphy (pro hac vice forthcoming)
**HAUSFELD LLP**
1200 17th St NW, Suite 600
Washington, DC 20036
202.540.7200
jpizzirusso@hausfeld.com
nmurphy@hausfeld.com

*Counsel for Plaintiff*